ANDERSON, Respondent, v. RUSSELL, Secretary of Agriculture, et al, Appellants.

(268 N. W. 386.)

(File No. 7940.   Opinion filed June 24, 1936.)

*Walter Conway,* Attorney General, *W. E. Weygint,* Assistant Attorney General, and *B. O. Stordahl* and *C. J. Delbridge,* Special Assistant Attorneys General, for Appellants.

*Louis H. Smith,* of Sioux Falls, for Respondent.

HANLEY, Circuit Judge. Respondent in the trial court sought an injunction against the appellants to restrain them from quarantining respondent's herd of cattle and forcing him to submit such cattle to a tuberculin test by appellants' agent.

The trial court entered an injunction order, by the terms of which appellants were enjoined "from in any manner quarantining plaintiff's herd of cattle until it is determined that said cattle are infected with tuberculosis, his farm and premises, and from subjecting his herd to the tuberculin test without his consent to ascertain the existence or non-existence of tuberculosis in said herd, and from interfering with plaintiff's business or property rights in said herd and farm."

The order entered by appellants which forms the basis of this litigation is as follows:

"South Dakota Department of Agriculture

"Special Quarantine No. A

"Whereas, The fact has been determined that the contagious and infectious disease known as bovine tuberculosis exists in herds of cattle in South Dakota, and

"Whereas, Cattle originating in South Dakota may not be transported interstate after December 31, 1935, for feeding and breeding purposes without having passed the tuberculin test unless such cattle originate in a modified accredited area, and

"Whereas, Dairy products originating in unaccredited areas may not enter the trade channels for sale in a number of the larger cities, and

"Whereas, Livestock breeders representing the cattle breeders in each of the counties affected, did on November 13, 1935, present

a resolution to the Secretary of Agriculture, State of South Dakota, asking for bovine tuberculosis testing in all herds for the establishment of a modified accredited area, and

"Whereas, The South Dakota Department of Agriculture and the United States Bureau of Animal Industry have agreed to co-operatively conduct a campaign of tuberculosis eradication in Aurora, Bon Homme, Brule, Buffalo, Charles Mix, Clay, Davison, Douglas, Hanson, Hutchinson, Jerauld, Lake, Lincoln, McCook, Miner, Minnehaha, Moody, Sanborn, Turner, Union and Yankton Counties, State of South Dakota, in conformity with the Uniform Methods, Rules and Regulations governing the Modified Accredited Area Plan;

"Therefore, The South Dakota Department of Agriculture in accordance with the provisions of sections 8065, 8066, 8067 and 8110 of the South Dakota Session Laws of 1919, and chapter 283 of the Laws of 1925, adopts the following regulations and rules:

"Regulation 1. No cattle shall be shipped, imported, driven, allowed to stray, drift or be otherwise moved into the above described quarantined area, except in accordance with the following rules:

"Rule 1. Cattle that have passed one offical tuberculin test.

"Rule 2. Cattle for immediate slaughter may enter the quarantined area to be slaughtered within ten days of such entry and during this ten-day interval they must be kept separate from other cattle.

"Rule 3. Steers, range cattle and semi-range cattle of recognized beef type may enter the quarantined area for feeding and grazing purposes under special quarantine and be confined separately from other cattle on the premises of the owner or on such premises as may be designated in the order of special quarantine.

"Rule 4. Bull calves under six (6) months of age of recognized beef type may enter the quarantined area for feeding and grazing purposes under separate quarantine according to Rule 3, provided such calves are castrated within ten days after arrival at point of destination.

"Rule 5. All cattle other than those described in Rule 1, 2, 3, and 4, must be subjected to an official tuberculin test before entering the above described quarantine area.

"Quarantine: It shall be the duty of the Department of Agriculture to quarantine all farms or places where the owners refuse to submit their respective cattle, or any of them, to the tuberculin test under this order; and under such quarantine, no livestock, livestock products, or any other moveable thing likely to contain infection shall be removed from the premises.

"Penalty. Any owner of cattle in any county, which has come under this Order, who refuses to submit his or her cattle to the tuberculin test, or endeavors to prevent the Department of Agriculture, or its agents, from carrying out the provisions of, or who violates any of the provisions of this Order, shall be guilty of a misdemeanor.

"This quarantine Order shall be in full force and effect on and after the 2nd day of December, 1935.

"[Signed] C. A. Russell
"Secretary of Agriculture."

This action was presented on an agreed statement of facts, the essentials of which stipulation are as follows:

That appellant C. A. Russell is the duly appointed, qualified, and acting Secretary of Agriculture of South Dakota, and that appellant Dr. T. H. Ruth is the duly appointed, qualified, and acting Director of the Division of Animal Industry of South Dakota; that each of these defendants supervises a large number of deputies and agents; and that all of them purport to act under the laws of South Dakota, and particularly under chapter 10, part 15, Title 6, S. D. Compiled Laws 1929 (section 8063 et seq.), and under such orders as the secretary of agriculture shall make.

Further, that plaintiff and respondent is, and has been for more than thirty-five years, a resident taxpayer citizen of Minnehaha county, S. D., and now owns and operates a farm in said county and state, and a herd of cattle that he has owned since 1918, and "that said herd has been, and is now, free from bovine tuberculosis, according to tests made by a duly licensed, practicing and competent veterinarian of the State of South Dakota, but not in the employ of the defendants, and has not been, and is not now, exposed to said disease by having mingled with or by now mingling with cattle, or coming into contact with cattle, infected with bovine tuberculosis"; that plaintiff has invested large sums of

money in said herd of cattle; that they have not been tested by any person or agent under the authority of the defendants herein; that any tests claimed to have been made by plaintiff showing freedom from tuberculosis are not accepted or recognized by the defendants.

That defendant C. A. Russell, under date December 2, 1935, issued the order of quarantine above quoted in full. (This order will hereafter be referred to as "Order A" in this decision.) Further, that by reason of such order defendants claim right to test all herds in this state, including plaintiff's, for the purpose of ascertaining existence or absence of tuberculosis in such herds, and claim right to quarantine herds, and any part or portion of the state of South Dakota, and did intend to test plaintiff's herd of cattle to ascertain existence or nonexistence of tuberculosis against his wish and desire and through compulsion, and would have done so but for the restraining order herein issued, and that defendants claim right to compulsorily test plaintiff's herd of cattle, and all other herds in the state of South Dakota, to ascertain the existence or nonexistence of bovine tuberculosis.

Subject to an objection of incompetency and immateriality, there follows in the stipulation a long history of the effort of the Bureau of Animal Industry of the United States Department of Agriculture and State Department to eradicate bovine tuberculosis and includes various co-operative agreements between the said departments and the Department of Agriculture of this state. Such history discloses that in July, 1923, there were only seventeen counties in four states certified as modified accredited areas, and that on the 1st of November, 1935, 88 per cent, of all the counties in the United States are so certified. That the test for bovine tuberculosis approved by the federal agency is the tuberculin test sought to be used by defendants herein. That under this cooperative program the state of South Dakota, through its Department of Agriculture, has tested 1,554,360 head of cattle, and that out of said number there were found to be 27,639 reactors or cattle found to be tuberculous. That prior to 1935 part of the expenses of the eradication program were paid by the state of South Dakota, and part by the federal government, but that in 1935 the federal government began to defray all of the expenses in connection with

such eradication, except some minor incidental expense, and that that was done by reason of the fact that this state had been severely affected by depression and drouth and was not in position to assume the burden of such eradication work. That under such cooperative agreements with the federal departments, it is the purpose of the state agricultural department to proceed to a complete test of all cattle in this state, to the end that it may all be made an accredited area; and that up until September 16, 1935, the testing of herds under such cooperative agreement was conducted on a voluntary basis, except in six counties where compulsory testing was performed under the Area Plan Act (Laws 1925, c. 283), and at that time it became evident that a 100 per cent. test in South Dakota could not be obtained under the voluntary basis, and therefore on September 16, 1935, the chief of the Bureau of Animal Industry of the Federal Department instructed the cooperative agents who were working in South Dakota to cease their work in such eradication unless a 100 per cent. test could be obtained, and ordered that all funds available therefor should be withdrawn unless assurance could be made satisfactorily that a 100 per cent. test could be obtained, and that the defendants in this action claim there is no way of obtaining a 100 per cent test of herds in this state for tuberculosis, except through a compulsory test under rules and regulations set forth in Order A, or under similar rules and regulations. That under the co-operative program, when an animal is condemned as tuberculous, such animal is required to be sold and the owner indemnified on the basis of replacement value, reached by agreement between the veterinarian making the test and the owner, and if they are unable to agree, the value is determined by appraisers, one appointed by the owner, another by the department of agriculture, and a third by the first two. The United States pays the amount of indemnity, which is limited as to various classes of cattle. That by reason of the co-operative program referred to between the government and the states, the states bounding South Dakota, i. e., Minnesota, Iowa, North Dakota, Montana, and Wyoming, have become modified areas under the rules of the United States Department of Agriculture, and that the state of Nebraska will become such on or before April 1, 1936, and that under the same program all of South Dakota west of the Missouri river has been tested 81 per cent.

That since November, 1934, the United States government has expended in South Dakota in this program $271,036.03 up to January 1, 1936, and that indemnity claims of owners of tuberculous cattle in the amount of $194,782.42 have been filed and have been, or will be, paid by the United States government, and that to complete the work of testing and paying indemnities an additional sum of $500,000 will be required, according to defendants' best information, and that for South Dakota to undertake the continuance fo such program at its own expense would constitute an enormous burden upon the taxpayers of this state. That the federal funds used for eradication of tuberculosis and indemnity will not be available after June 30, 1936, according to the orders of the federal department, and thereafter the state of South Dakota will have to pay one-half of such indemnities and the federal government will pay the other one-half, and that in order to complete the works of eradication substantially four months will be required. That by reason of the fact that South Dakota has not become an accredited area, defendants claim the people of South Dakota are discriminated against and damaged in their business by rules of other states relative to the transportation of cattle.

There follows a long order of the Department of Agriculture of the State of Iowa, indicating that rigid quarantine rules are to be applied to cattle shipped into that state, and discriminating against cattle that do not originate in modified accredited areas, and the defendants state that similar orders are proposed in other states bounding South Dakota, and defendants claim that by reason of South Dakota not being an accredited area, several cities of the United States have placed an embargo upon butter from this state, notably among such being Cleveland, Cincinnati, Canton, Columbus, Dayton, and Akron, O.; Chicago and Rockford, Ill.; Flint, Mich.; Kansas City, Mo.; and the entire state of Washington.

Further, that it is a generally accepted scientific fact that human beings contract tuberculosis by reason of drinking milk or eating butter from tuberculous cattle, and for that reason it would be for the benefit of the health of people of this state that such tuberculosis among cattle be eradicated as nearly as practicable.

That it is an operating rule under the co-operative program

referred to that all herds of cattle are presumed to be exposed to tuberculosis, or are infected, until proven by the tuberculin test to be free therefrom, and that it is upon such operating rule that this quarantine order and others are based.

That at the present time in South Dakota there are nineteen counties which defendants claim are accredited areas, seventeen of such counties being west of the Missouri river and two east thereof, and that there would be no means by which said modified accredited areas or other areas to be tested 100 per cent. could be maintained as accredited areas and the herds therein protected from infection except by some rule of quarantine by which importation of cattle, possibly infected, could be barred, and there would be no means of maintaining a modified accredited area as such except through quarantine.

That in determining the existence or non-existence of bovine tuberculosis there is no practical means of testing for the disease except through a biological test, as there are no visible symptoms of the disease observable on inspection, and the only test recognized by the Bureau of Animal Industry of the United States Department of Agriculture is the tuberculin test hereinbefore described.

That it is a commonly accepted scientific fact that if one animal in a herd is infected with tuberculosis it is likely that it spreads to and infects other members of the herd.

That prior to the entry upon the farm of plaintiff for the purpose of subjecting the herd to compulsory testing for tuberculosis, the defendants sent to the owner of such herd a notice, which is set out in the stipulation in full, and which provides substantially that testing is to be done and inclosing a copy of Order A, indicating when the testing will probably be done; advising that there will be no cost to the owner of the cattle; advising as to the details of payment and disposing of condemned animals; and advising of the co-operating of the federal government in the program.

The stipulation further provides that no action has been taken in Minnehaha county, or in the county auditor's office thereof, or through the board of county commissioners thereof, which has resulted in said county becoming a county under the county area plan, or under the accredited area plan relating to bovine tuberculosis under the provisions of the Area Plan Act.

The stipulation further provides, subject to an objection of immateriality, that there have been introduced in the South Dakota Legislature on several occasions, bills which would in substance make compulsory the testing of cattle for tuberculosis, and that such bills have each time been defeated; that such a bill was introduced in the 1935 Legislature, and that the same was defeated; that said bill commanded the secretary of agriculture to administer a specific kind of tuberculin test to all cattle in South Dakota, and provided that his agents might enter any place to make such test, and that any interference with such agent would constitute a misdemeanor; the secretary of agriculture was in such bill specified as the person to sell and distribute tuberculin; said bill also provided that when any animal was ordered killed by the inspector the owner must be notified within forty-eight hours, and said owner had the right to appoint his own veterinarian, and these two would then appoint a third veterinarian, and the three would determine whether the animal had tuberculosis; that said bill was defeated; that said bill was practically identical with the Iowa tuberculin testing law.

It is asserted in this case that under the rules of the United States Bureau of Animal Industry, a modified accredited area shall be one in which tuberculosis eradication has proceeded to a point where a universal test of the cattle in such area shows infection of less than one-half of one per cent.

The trial court adopted as findings of fact the full detailed stipulation of facts presented by the parties in this action, and thereupon entered a decision and entered an order as above set forth.

The inception of legislative concern with the matter of bovine tuberculosis control is reflected in chapter 360, Session Laws of 1917, section 1 of which provides as follows: "That it shall be the duty of the State Live Stock Sanitary Board to cause to be tested for tuberculosis any cow or cows in a dairy herd from which milk is sold for human consumption, when requested so to do by three or more patrons of such herd, and when it shall be deemed by such Board that such test is advisable and necessary." This statute, in its essentials, is now found in section 8074, Code 1919. Other sections in the original act made some provision for compensation for condemned animals.

The law relative to tuberculosis eradication was made more comprehensive and is reflected in sections 8110 to 8115, inclusive, Revised Code 1919.

A comprehensive act was passed in 1913 being chapter 265 of the Session Laws of that year, creating a new livestock sanitary board. This act was carried into sections 8058 to 8079, inclusive, Code 1919, in modified form.

A substantial portion of the foregoing law was treated in an amendment contained in chapter 340, Session Laws 1919.

The civil administrative code, being chapter 115, Session Laws 1925, re-enacted sections 8063 to 8077, inclusive, and sections 8110, 8111, 8113, 8114, and 8115, with amendments (Comp. Laws 1929, §§ 8063-8077, 8110, 8111, 8113-8115), as above indicated. This enactment was approved March 3, 1925.

A compulsory testing law initiated by petition of stock owners in a given county was enacted in 1925 and is chapter 283 of the session laws of that year. This act was approved March 5, 1925. It will, in the course of this decision, be referred to as the Area Plan Act.

The appellants in this case depend for the authority for the order in question upon sections 8063, 8065 and 8110 of the Code, as amended. Such sections in their present form are as follows:

"§ 8063. Rules and Regulations. The Secretary of Agriculture through the Division of Animal Industry shall have power to establish, amend and repeal such general rules and regulations, not inconsistent with the laws of this state, as may be necessary for the proper enforcement of the provisions of this article and any other law with the enforcement of which such Division is charged; which rules and regulations shall become effective upon the approval of the attorney general and the publication thereof once each week for three consecutive weeks in a daily newspaper of general circulation in the state."

"§ 8065. General Powers—Quarantine. The Secretary of Agriculture through the Division of Animal Industry shall have power to take all such measures as he may deem necessary to control, suppress and eradicate, all contagious, infectious, epidemic and communicable diseases among the domestic animals of this state; to regulate or prohibit the arrival or departure from, or

removal from one to any other portion of the state of any such infected or exposed animals and at the cost of the owner thereof to detain any such animal found in violation of the provisions of this chapter or any order, rule or regulation of such Secretary and Division; to quarantine any city, town, civil township or county in the state, and any stall, inclosure, barn, stable or building; or any domestic animal therein, which may be infected with any contagious, infectious, epidemic or communicable disease, or which has been exposed to infection therefrom, or which is infected with insects or any other means by which any such disease is communicated; to make such orders as he may deem necessary for the proper control, suppression and eradication of any such disease; and to kill any animal so affected when any such disease is determined to be incurable; providing that written notice shall be given, to the owner or keeper of any livestock, of the establishment of any quarantine as to such livestock."

"§ 8110. Tuberculosis Eradication. The Secretary of Agriculture through the Division of Animal Industry is hereby authorized and empowered to take all necessary measures for the investigation, control and eradication of the disease of tuberculosis in cattle; to co-operate wiht the United States Bureau of Animal Industry in establishing accredited herds; to establish and enforce quarantines, and inspect and test cattle through its accredited agents; to require the slaughter of animals adjudged to be affected with tuberculosis; to prescribe methods of appraisement and of shipping and handling such animals, and to employ necessary inspectors in such work at a salary not to exceed one hundred and fifty dollars per month."

The Area Plan Act provides that when any number of resident owners of cattle constituting a number equal to 60 per cent. of the number of owners of cattle and 60 per cent. of all cattle in any county in this state petition the board of commissioners of the county for the establishment of a county area plan for the eradication of bovine tuberculosis, and after hearing upon said petition, if the same be found sufficient, that it shall be the duty of the secretary of agriculture to enroll such county in the county area plan. Likewise, 75 per cent. of the owners of breeding cattle in any county may, as to that class of cattle, seek and obtain enrollment in such plan. The act provides for the raising and ad-

ministering of funds by taxation for indemnity and administration purposes, and provides for veterinary inspectors to accomplish the necessary testing for tuberculosis. Any animals that are condemned are appraised by the owner and a representative of the department of agriculture of the state or of the United States. If these parties cannot agree, then a board of appraisers is appointed, one by the department of agriculture, one by the owner, and a third by the first two, and their appraisal shall become final. The department of agriculture is given power to make quarantine rules and regulations and to enforce the same. The department of agriculture may quarantine all farms or places where the owners refuse to submit their respective cattle, or any of them, to the tuberculin test, under the accredited area plan, · and under such quarantine no livestock, livestock products, manure, or other removable thing, likely to contain infection, shall be removed from the premises. Further, the act makes it a misdemeanor for any owner of cattle in any county which has come under the accredited area plan to refuse to submit his or her cattle to the tuberculin test, or who endeavors to prevent the department, or its agents from carrying out the purposes of the act. It is conceded in this appeal by the parties that the Area Plan Act is in fact compulsory in nature.

Appellants state the question before this court on this appeal substantially as follows: Is the law under which appellants assume to act in this matter unconstitutional by reason of unlawful delegation of power by the Legislature to the secretary of agriculture, or by reason of the fact that such law authorized the taking of property without due process of law, or is it class legislation barred by the Federal and State Constitutions? And, secondly, is the order of the secretary of agriculture enforcing compulsory testing of all cattle in South Dakota by the tuberculin test to ascertain the existence or nonexistence of bovine tuberculosis, and the rules that he has promulgated for the eradication of said disease, reasonable under the facts and circumstances shown by this record and under the laws of this state, conferring authority upon him?

The position of the respondent as to the issue here is that this state has no compulsory testing law, and that the authority of

the secretary of agriculture is not broad enough to support the order which he entered, in the absence of a compulsory testing law.

Suggestion has been advanced in course of presentation of this case that the Area Plan Act repeals by implication those sections of statute supra upon which appellants rely for authority for making and enforcing Order A.

While it is true that Order A recites the Area Plan Act as one source of statutory authority under which it is drawn, it is now conceded that such cannot be true and such authority, if it exists, must be resident in sections 8063, 8065, and 8110. It is a fact in this case that none of the conditions precedent provided for in the Area Plan Act, such as initiation by petition and subsequent proceedings, have been established. Obviously, all of such prerequisites are essential under the act to invoke in the secretary of agriculture the powers therein conferred upon him to compel submission of cattle to the tuberculin test and apply quarantine upon the owner's refusal to so submit.

Hence it inevitably follows that if there be repeal of such authority as is conferred by sections 8063, 8065, and 8110, either expressly or impliedly, by the Area Plan Act, there exists no statutory authority for the attempted action of appellants and such fact would be decisive of this case adversely to them.

Obviously, there is no express repeal of the particular sections relied upon, indicated in the Area. Plan Act.

Under the view of this case that we take, any decisions upon, or investigation of, the question of repeal by implication, is unnecessary and immaterial, and we refrain from making any decision upon that question.

We proceed upon the assumption that sections 8063, 8065, and 8110 are effective and in force.

■ Before entering upon what are deemed the salient and controlling considerations in this decision, in the interest of clarity it should be stated at the outset that nothing herein contained is intended to be, or is to be construed as, either an express or implied holding that the Legislature does not have power, under the general police power inherent in every sovereign state, to enact laws of a compulsory and commanding nature in reference to

eradication of communicable disease in domestic livestock, the effect of which laws would be to require submission by owners of their livestock to such recognized tests, by such officials as are prescribed.

On the contrary, and without, of course, binding itself to any specific statutory language, this court is of the view that the legislative branch is empowered to make such compulsory legislation that shall be coercive on the citizenry, surrounded by such safeguards for the protection of the personal and property rights of the citizenry, as shall be reasonable and sound, consonantly with acceptable principles of exercise of police power.

This pronouncement disposes of the greater volume of authority presented to this court by appellants in support of their contentions, as such authority is simply supportive of such rule. There is an amplitude of authority in the several jurisdictions of this country equally supportive of the rule.

It is unnecessary to engage at length herein in a detailed discussion of the many broad principles related to the existence of police power in a State Legislature, which will dispose of much additional authority cited in this case.

This attitude is pertinent in this case, since it is the view of this court that the real question in this case is not that of existence or nonexistence of power in the Legislature to do what appellant seeks to do, but, rather, the issue narrows to a question of whether or not the Legislature has exercised such power at all, assuming its existence in the Legislature, by virtue of the claimed delegation of power to appellant. Further, if it be determined that there was such delegation of power, is it of such character as to be within the rule of reasonableness applying to delegation of police power, and secure from attack on grounds of subversiveness of constitutional guaranties to the individual and his property?

This court is of the view that sections 8063, 8065, and 8110, hereinafter designated as "authority statutes," do not confer upon the secretary of agriculture of this state authority for making and enforcing Order A.

Further, if such authority statutes did assume to confer such authority, neither the attempted delegation of power nor its attempted exercise is proof against successful attack on the grounds

that reasonableness of regulations, due process of law, and indemnity for confiscated property are insufficiently assured to constitute a proper exercise of the power.

Patently there are two classes of statutes relative to this subject. One may be designated "authority" statutes, the other "compulsion" statutes. The authority statutes considered here were clearly intended to be, and are, "authority" statutes.

The legislative history of these laws discloses that repeated efforts to pass "compulsion" statutes have failed. No later than 1935, in the throes of the present eradication program, such an effort was unsuccessful. See stipulation of facts.

The authority statutes merely confer upon appellants the power and right to make investigations and quarantine and control in event of the established existence of communicable disease as a fact. The legislative intent is clear in this respect, both in the matter of refusal to pass compulsory general legislation and by the passage of the Area Plan Act, which in effect leaves the question of whether or not they shall be compelled, to a majority of cattle owners in a given area.

We agree with the Iowa court in Loftus v. Department of Agriculture, 211 Iowa, 566, 232 N. W. 412, 417, wherein the court said: "As expressed in State ex rel. Spillman v. Splittgerber, supra [119 Neb. 436, 229 N. W. 332]: 'The Legislature may in the exercise of the police power require that the owners of breeding cattle submit such animals to the tuberculin test.'"

The Legislature in this instance having failed to do so leaves the statute deficient in this respect and does not confer the power of compulsion upon appellants.

In Deeters v. Clarke, 23 S. D. 298, 121 N. W. 788, 789, a cattle dipping case, this court said: "It is well settled that in proceedings had under a statute, affecting the title or interests of parties in property, the statute must be strictly complied with, and that parties assuming to act under such statute must so conduct the same as to show that they are acting within the powers conferred upon them by the statute."

It may be freely conceded that in a delegation of police power properly made, to an executive officer or board, the Legislature may leave to such agent's discretion the making of minor ad-

ministrative rules and regulations and the establishment of the administrative mechanics to effectuate the powers actually conferred by the Legislature.

That is vastly different than if the Legislature were to make an attempted blanket and plenary delegation of its legislative prerogative to the secretary of agriculture and say: "We believe some control is needed over animal husbandry in this state. You are empowered to make any rules or laws you like in the matter. We give you a free hand."

Such a theory has already fallen under the condemnation of this court. For a much amplified illustration of similar character, see St. Charles State Bank v. Wingfield, 36 S. D. 493, 155 N. W. 776, 778. In that case the superintendent of banks sought by rule or order to require state banks to keep their reserves within the state. This court said: "Such a requirement would certainly involve an exercise of the highest discretion, and if it were clear that the Legislature had attempted or intended to confer upon an executive or ministerial officer authority to require reserves of any bank to be kept within the state, it would be a delegation of power in contravention of those provisions of the state Constitution which vest all legislative power in the legislative branch of the government, or retain it through the initiative, in the people themselves."

Police power has probably never been defined in the sense that its boundaries have been made adamant. It is, and must be, at once, flexible and limited. It has been said by this court in State v. Wood, 51 S. D. 485, 215 N. W. 487, 488, 54 A. L. R. 719: "It has been said that the police power is one of the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government' (Dist. of Columbia v. Brooke, 214 U. S. 138, 29 S. Ct. 560, 53 L. Ed. 941), and the only limit to its exercise in the enactment of laws is that they shall violate no provisions of the state and national Constitutions. [Citing authorities.] But, while it extends to regulations promoting public health, morals, safety, convenience, and general welfare, it has its limits and must stop when it encounters the prohibitions of the Constitution. [Citing authorities.]"

The foregoing is a limitation upon the Legislature itself.

Much more circumscribed is the power of the Legislature to delegate police power. Any such delegation must be clear and express. See Cities of Mitchell and Huron v. Board of R. R. Com., 44 S. D. 430, 184 N. W. 246. See, also, Phenix Ins. Co. v. Perkins, 19 S. D. 59, 101 N. W. 1110; and Brookings County v. Murphy, 23 S. D. 311, 121 N. W. 793.

Can it be successfully urged that there was any delegation or attempted delegation of power to appellants in the authority statutes, to permit of so drastic an action on their part as to compel a citizen's submission to Department practices as attempted in Order A? We think not. The paucity of language in behalf of compulsion in the authority statutes is eloquent.

Since there is a want of necessary power in the authority statutes themselves both the appellants and this court are powerless to supply it. See A. L. A. Schlechter Poultry Corp. v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947. In State ex rel. Botkin v. Welsh, 61 S. D. 593, 251 N. W. 189, 205, this court said: "Clearly legislation by the director of taxation is utterly void whether undertaken of his own motion or because he believes (whether rightly or wrongly) that the terms of the statute authorize it." Again in Deeters v. Clarke, supra: "While it was perhaps proper for the state board to request the defendant [an agent of State Livestock Commission] to proceed in the discharge of his duties in protecting the live stock of the county, they could not authorize him, nor did they attempt to authorize him, to proceed otherwise than as provided by the statute, and hence the order of the board did not and could not in any manner abrogate the provisions of the statute or authorize the defendant to take proceedings other than those prescribed by the statute."

We are forced to conclude that the Legislature did not, and did not attempt to, delegate the compulsory power to appellants in the authority statutes, and further, for reasons hereinbefore appearing and hereafter alluded to, that had the Legislature attempted such sweeping delegation of power, it would fail as an improper delegation.

On the assumption, and it now must be a hypothetical assumption, that the Legislature sought to confer the claimed powers, and

had the right to do so, could their exercise be sustained as within the rule of reasonableness and the guaranties in the Constitution?

No hearing is provided for in the authority statutes or in Order A.

The "due process of law" clauses in American Constitutions are universally held to imply a right to judicial hearing, or in lieu thereof, some impartial hearing that gives the interested party substantial protection in his right to present his cause.

This court said in Re Construction of Constitution, 3 S. D. 548, 54 N. W. 650, 652, 19 L. R. A. 575: "It is a principle declared by our constitution (section 2, art. 6), and of universal recognition, that no person shall be deprived of life, liberty, or property without due process of law. There can be no due process of law unless the party to be affected has his day in court."

The principle has been often times sustained and preserved by this court. See Beveridge v. Baer, 59 S. D. 563, 241 N. W. 727, 84 A. L. R. 189; Caldwell v. Pierson, 37 S. D. 546, 159 N. W. 124; Evans v. Fall River County, 9 S. D. 130, 68 N. W. 195.

Failing in accurate fact finding in respect to existence or non-existence of disease through inadequacy or absence of some kind of impartial hearing (and one government or state veterinarian can conceivably be wrong), there is serious question on the matter of indemnity. The indemnity provisions presuppose the established existence of disease in the animal involved, which fact naturally bears a direct relation to the value of, and "just compensation" for, such animal.

The case of Neer v. State Live Stock Sanitary Board, 40 N. D. 340, 168 N. W. 601, upon which appellants earnestly rely, deserves some especial consideration, because the law therein relied upon is less a "compulsory" and more an "authority" statute than others advanced by appellants which have received court sanction.

This case involved a mare, disclosed by a recognized blood test to have a communicable disease known as dourine. The board sought to kill her. The owner insisted she did not have dourine in fact, as no physical symptoms developed in a period much longer than normal, or at all. The case is readily distinguishable from the one at bar particularly in two important respects: First,

the mare had responded positively to a dourine test. In the instant case the cattle are presumably disease free. (See stipulations.) Secondly, the North Dakota law provided for a hearing substantially as that provided for in the bill defeated by the South Dakota Legislature in 1935. (See stipulation.)

North Dakota held by a divided court that the hearing provision satisfied constitutional requirements. Upon rehearing the court, out of equitable considerations, extended further right of hearing to the owner than the statute contemplated. No such procedure is established by our present law.

We are keenly sensible to the impasse created by the deficiency in our statutes for the secretary of agriculture. He is expected to investigate to determine disease existence. Upon its determination he is expected to quarantine and eradicate. Upon meeting resistance he cannot determine disease existence without compulsion upon the owner, which power he lacks; he having only authoritative power to proceed upon known existence of disease and having to rely upon means other than compulsion to determine that fact. From a practical standpoint, he is in a complete cul-de-sac. To obtain the end he seeks—a most desirable one in this instance— he undertakes to extricate himself by issuance of the unauthorized Order A. By this means he undertakes to compel submission to the test, patterning the order upon the dormant Area Plan Act, by using quarantine to coerce submission to the test. Further, he constitutes it a crime to violate the order.

As to the latter effort, no citation of authority is necessary to sustain the pronouncement that under the authority statutes herein considered, there exists no power in appellant to define crimes, or designate citizens criminals, by executive order.

The situation for the owner is that he must submit his cattle for testing by an agent of the appellants, whose test and decision are conclusive, there being no hearing, or the owner shall submit to a quarantine which stifles his business and/or possibly requires him to defend an attempted misdemeanor charge.

Such a situation is intolerable to the law as it exists in this state.

It is true that section 8065, being the general quarantine power statute, provides that appellants shall have power to quarantine an

animal infected with communicable disease, "or which has been exposed to infection therefrom."

It is true that a calculation based on the number of cattle tested, and the number found infected in this state (see stipulation), discloses that about 2 per cent. were so infected. On such basis, it is not unreasonable to predicate the presumption that probably all cattle in the state have been more or less exposed. That remains presumption, however. Further, in this case the stipulation asserts no exposure, and freedom from disease, according to private test. Moreover, and concededly, the quarantine is here used to compel the test, rather than merely as a segregation of exposed cattle.

If any sanction for Order A be sought to be extracted from this provision of the statute, the foregoing, in our view, completely emasculates the contention.

The secretary of agriculture cannot breathe life into a corpse and do by indirection or subterfuge that which he lacks power to do directly.

The resolution of this entire problem has been, by no means, free from difficulty. The highly salutary co-operative program of the federal government and this state constantly obtrudes its benefits, both from a health and economic standpoint, to obscure the evils of the method sought to be employed. Therein lies the definitely iminent and menacing danger. If such unrestricted and unguarded attempted legislation by executives can be sanctioned, as a matter of law, when used for a good purpose, it is equally available for an arbitrary, tyrannous, oppressive, evil, or selfish one.

Law may not be officially violated, and the legal barriers, which stand as a protection to the citizen between him and his government and its officials, may not be trammeled because, in a specific instance, such course may appear to be a short cut to a desirable end.

We revert with approval to language attributed to Justice Cardozo and quoted by this court in State v. Wolfe, — S. D. —, 266 N. W. 116, 119. The following language was employed by the learned justice in a discussion of the constitutional provision that one accused of crime shall not be compelled to give evidence against himself: "The privilege may not be violated because in a particu-

lar case its restraints are inconvenient or because the supposed malefactor may be a subject of public execration or because the disclosure of his wrongdoing will promote the public weal."

One may conjecture why, in this instance, a small portion of the state refuses voluntary co-operation to appellants and thus fails to give vitality to that power and authority which they do possess under the authority statutes. That, however, is not the legal problem. Likewise, the manifold benefits to South Dakota set forth in the stipulation of facts, which are urged as the inducing cause for the action of appellants, are also immaterial on the question of law to which the court must address and confine itself.

Unquestionably, the far-reaching results are the more sound and desirable, we are convinced, in the conclusion here reached; but if the immediate result be undesirable, that is not the fault of either the appellants or the court, neither of whom may legislate. Corrective power lies with the Legislature.

It remains the unequivocal duty of the court to sustain the basic premise of American government: That it is a government of law and not of men.

The injunctive order appealed from is affirmed.

CAMPBELL, WARREN, and RUDOLPH, JJ., concur.

POLLEY, P. J., and ROBERTS, J., not sitting.

HANLEY, Circuit Judge, sitting in lieu of ROBERTS, J., who deems himself disqualified.